

## NUMBER 13-13-00069-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

## IN THE MATTER OF M. A., A JUVENILE

**On appeal from the County Court at Law
of Hill County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Perkes
Memorandum Opinion by Chief Justice Valdez**

Appellant, M.A., pursuant to a plea agreement with the State, pleaded "true" to the offense of robbery, a second-degree felony. *See* TEX. PENAL CODE ANN. § 29.02 (West 2011). By one issue, appellant contends that the trial court failed to consider mitigating evidence when it sentenced her to the Texas Youth Commission ("TYC"). We affirm.[1]

---

[1] This case is before the Court on transfer from the Tenth Court of Appeals in Waco pursuant to an order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

# I. STANDARD OF REVIEW AND APPLICABLE LAW

We review the trial court's commitment of a juvenile found to have engaged in delinquent conduct under an abuse of discretion standard. *In re P.E.C.*, 211 S.W.3d 368, 370 (Tex. App.—San Antonio 2006, no pet.); *In re K.J.N.*, 103 S.W.3d 465, 465–66 (Tex. App.—San Antonio 2003, no pet.); *see also In re J.L.H.*, No. 10-08-00126-CV, 2009 Tex. App. LEXIS 519, at *5–7 (Tex. App.—Waco Jan. 28, 2009, no pet.) (mem. op.) (applying an abuse of discretion standard of review to trial court's disposition decision). To determine if there is an abuse of discretion, we review the entire record to determine if the trial court acted without reference to any guiding rules or principles. *In re K.J.N.*, 103 S.W.3d at 465–66.

The guiding rules and principles governing the suitable disposition for a child who has been adjudicated delinquent are located in the Texas Family Code. *Id.* Specifically, section 54.04(i) authorizes the court to commit a juvenile to TYC upon three findings: (1) "it is in the child's best interests to be placed outside the child's home"; (2) "reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for the child to return to the child's home"; and (3) "the child, in the child's home, cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions of probation." TEX. FAM. CODE ANN. § 54.04(i) (West Supp. 2011); *In re K.J.N.*, 103 S.W.3d at 465–66. We view the evidence in the light most favorable to the juvenile court's ruling, affording almost total deference to its findings of historical fact supported by the record, but review de novo the court's determination of the applicable law, its application of the law to the facts, and its resolution of any factual issues that do not involve

credibility assessments. *In re K.T.*, 107 S.W.3d 65, 75 (Tex. App.—San Antonio 2003, no pet.).

## II. THE EVIDENCE

Here, appellant pleaded "true" to committing the offense of robbery. Pursuant to the plea agreement, the State agreed not to charge appellant with aggravated robbery. The trial court then accepted appellant's plea and held a disposition hearing to determine appellant's disposition. At the disposition hearing, a juvenile probation officer with the Hill County Juvenile Probation Department, Terry McElrath, testified that he is familiar with appellant's case and recommended that appellant be committed to TYC for an indeterminate period of time not to exceed her nineteenth birthday. McElrath stated that commitment to TYC would be in the best interest of society and appellant. According to McElrath, appellant had been in the detention facility before the disposition hearing, and her behavior was "fine." McElrath stated that appellant was attending classes at the facility and agreed with appellant's trial counsel that she "was doing fairly well" in her classes.

Appellant's father, Marcus, testified that although he separated from appellant's mother and they stopped living together, he spends time with appellant every day. Marcus stated that appellant's upbringing has been "fairly normal" and she has had "good behavior." Marcus said that appellant made him "proud" and that he often went to watch her perform at her extracurricular activities, which included playing basketball. Marcus testified that appellant's behavior when she was arrested for committing robbery was "abnormal" for her.

On cross-examination by the State, Marcus stated that he did not "see" appellant's criminal behavior "coming." Marcus agreed with the prosecutor that appellant "got put in some kind of program" in Dallas County in January 2012, after she committed the offense of theft. Marcus testified that he talked to appellant about it. When the prosecutor asked Marcus if he talked to appellant about a theft that she had committed on "March 15" at Dillard's, Marcus replied, "No" because appellant did not tell him about that theft. The prosecutor asked Marcus if he had talked to appellant "about the June 7th theft at [a] Polo store up in Allen, Texas?" Marcus responded, "I didn't talk to her. I talked to her mother about that." The prosecutor asked, "How about the robbery down here the following day on June the 8th, 2012? Did she talk to you about that?" Marcus said, "No, she didn't talk to me about that. I talked to her mother." The prosecutor asked, "Then how about the August 22nd theft there at the True Religion store up in Allen? Did she talk to you about that one?"[2] Marcus replied, "No."

Appellant's mother, C.A., testified that appellant has lived with her, but that Marcus has also cared for appellant. C.A. stated that she has "never" had "problems" with appellant not attending school or not receiving "fair" grades; however, appellant began misbehaving when she began "hanging with" a new group of friends.

C.A. testified that once appellant had an abortion, "she really just gave up." According to C.A., after the abortion, appellant's behavior changed and "she started getting attitudes, mood swings." C.A. claimed that appellant then began "hanging with another group of girls that was stealing" and that she told appellant she could not "hang

---

[2] The trial court admitted State's exhibit four, a police report regarding a theft committed on August 22, 2012. The report states that appellant was taken into custody after allegedly distracting an employee of a store so that her friends could steal merchandise. According to the report, "[t]he total amount taken was $1439.86."

4

with them." However, appellant would "get mad." Appellant's attorney asked, "And ultimately hanging with these different girls, that's what led her to being here in detention and here in court today?" C.A. replied, "Yes." On cross-examination, C.A. testified that she contacted appellant's school and "found out that [appellant] was leaving school and then would go—return to the school when it's time for me to pick her up."

C.A. believed that appellant would benefit from counseling. When asked where the trial court should place appellant, C.A. stated that she "[felt] like boot camp would be better for her. TYC would—it's like a prison. I think she needs to be rehabilitated and talk to some counselors and get back on track."

When asked on cross-examination by the State if appellant talked to her about the crimes she committed, C.A. said, "Yes." C.A. stated that appellant was previously caught stealing in Allen and that appellant was "supposed to started [sic] probation for that, and then this happened." When the prosecutor asked C.A. about an alleged theft committed by appellant at Dillard's in Cedar Hill "way back in March," C.A. said, "I was forced to pick her up again, and they said they was going [sic] to send me some quick papers. Never got a paper in the mail or never heard anything else about the case." When asked if she talked to appellant about "theft," C.A. stated that she talked to appellant until she was "blue in the face." C.A. testified that appellant knew what she was doing was wrong. C.A. agreed with the prosecutor that the robbery that appellant had pleaded "true" to in this case occurred one day after appellant had been detained in Allen for theft. When asked if appellant had told her about any other thefts, C.A. said, "No. She would like have stuff and I would ask her where she get it from, and she was

5

like she borrowed it . . .   But—and then I started putting two and two together and her dad started saying she's stealing.  She hanging [sic] with the girls.  She's stealing.  And I would get on her."

On re-direct examination by appellant's trial counsel, C.A. stated that when appellant was arrested for robbery, she was with two other girls who had "bagged up two bags of Polo bags, which you put clothes in. . . .  And that [a friend] gave [appellant] the spray and [told appellant to] spray her while we run out."[3]

Appellant testified that when she committed the robbery on June 8, 2012, she sprayed mace at a store employee.  On cross-examination, appellant explained that she sprayed mace at the employee because she was not afraid to do so, while her friend who actually carried the mace in her purse was afraid.  Appellant apparently sprayed the mace at the employee in an effort to escape capture.

When asked if the other instances of "shoplifting" that the prosecutor attributed to appellant happened, appellant said, "Yes."   The prosecutor asked Marcus and C.A. about several other instances when appellant had been caught stealing, including:  (1) a theft that occurred in January 2012 in Dallas County; (2) a theft at a "Dillard's in Cedar Hill on March 15"; (3) a theft on June 7, 2012 in Allen, Texas; (4) the robbery committed on June 8, 2012; and (5) a theft on "August 22[, 2012] there at the True Religion store up in Allen."

Appellant said she had a "fairly normal childhood."  She then revealed that she had had an abortion.  Appellant stated that she felt "bad" after the abortion and that she "gave up" "going to school" and achieving good grades.  Appellant said that she

---

[3] The "spray" was mace.

6

"thought that [her mother] was a liar because she lied" about her baby not having a heartbeat when in fact it did. Appellant testified that not having her baby "changed [her] whole life" because she "[felt as if her] life just went down."

Appellant claimed that one of her friends "taught [her] how to go in the stores and steal, take buzzers off the clothes." Appellant admitted that she went to "stores" and stole merchandise. Appellant testified that when she committed the offenses, she "thought it was easy and all funny"; however, appellant stated she now realized "it's not."

On cross-examination, appellant admitted that, in addition to the four thefts and one robbery for which she was caught, she "stole stuff" and did not get caught on other occasions. Appellant testified that on multiple occasions she had stolen merchandise and had not been caught and that she believed that she was caught stealing less often than she had not been caught. Appellant stated that "on June 7th," she did not go to jail "on the theft case" but that she went to jail "for [being a] runaway."

### III. ANALYSIS

By her sole issue, appellant contends that the trial court abused its discretion in committing her to the Texas Youth Commission ("TYC"), and failing to consider "strong evidence of mitigation." Specifically, appellant argues that the "severe" punishment in this case was not necessary due to mitigating evidence that she has a supportive family with a normal background, suffered trauma because her mother "forced" her to get an abortion, suffered from untreated depression, took responsibility for the crimes she committed, "made the best of the situation" of being detained by behaving and achieving good grades, and "had never been handled as a juvenile in the justice system

7

before." Appellant does not state which of the three required findings is not supported by sufficient evidence. Nonetheless, we will address all three findings.

Viewing the evidence in the light most favorable to the trial court's judgment, we conclude that the evidence showed that after attempting to leave a store without paying, appellant and a friend were caught with $178 worth of merchandise in a brown bag. In order to facilitate her escape, appellant sprayed mace at the employee. Appellant was not afraid to spray mace at the employee and at the time, believed that stealing was "funny."

When appellant committed the robbery, she was on probation for committing another offense. In fact, appellant had committed a theft the day before she committed the robbery. Appellant had been caught for committing several other thefts before she committed the robbery in this case. Appellant admitted that she had also committed several other thefts for which she had not been caught.

Appellant's mother suspected that appellant had engaged in other thefts, but was not aware of those instances. C.A. talked to appellant until "she was blue in the face" concerning appellant's offenses. However, appellant did not stop committing the offenses and then committed robbery by spraying mace at a store employee. Although appellant's father stated that he has contact with appellant on a daily basis, appellant continued to commit the offenses.

Finally, the trial court relied on a psychological report that stated that appellant "will need to be handled in a matter-of-fact, authoritative manner in a structured setting in which there are clear expectations for school achievement as well as personal behavior [which is] necessary in order to make permanent changes in her behavior

8

patterns and personal attitudes." The psychologist stated, "Given that [appellant's] parents have been unable to bring her conduct into compliance since her January 2012 adjudication, placement in a structured residential program emphasizing these things [is] in order for her." The psychologist recommended that there not be a pre-determined length of time in such placement and that, instead, her placement should be dependent on her conduct and achievement. C.A. also testified that she believed that appellant would benefit from a "boot camp" setting.

The trial court's finding that it is in appellant's best interest to be placed outside her home is supported by evidence that her parents had attempted to control appellant by talking to her, but had been unsuccessful, and the psychologist's recommendation that appellant be placed in a structured environment. The evidence also supports the trial court's finding that reasonable efforts were made to prevent or eliminate the need for appellant's removal from the home and to make it possible for the child to return to the child's home. Appellant had been caught on four prior occasions for theft and for being a runaway and then returned to her home. Appellant had also been placed on probation. However, despite her parents' efforts, appellant continued to steal merchandise. Also, despite being caught on other occasions, detained, and placed on probation, appellant escalated her efforts to steal merchandise by attacking an employee with mace. And, while waiting for a disposition in the current case, appellant was apprehended with some friends who had stolen a large amount of merchandise from the True Religion store. Finally, sufficient evidence was presented that appellant, in her home, cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions of probation, evidence was presented to the

trial court that appellant had been placed on probation and had been returned to her parents and that she committed this robbery. There was also evidence presented that appellant, after committing the robbery, while in her parents' care and mother's home, was again arrested for theft.[4] Based on our review of the record, which includes evidence that appellant committed a second-degree felony, admitted to committing thefts for which she was caught on five occasions and to committing thefts for which she had not been caught, and she lacks supervision in her home as evidenced, in part, by her continued delinquent conduct, we conclude there is sufficient evidence to support the order of commitment. We conclude that the trial court did not abuse its discretion by committing appellant to TYC for an indeterminate period. We overrule appellant's sole issue.

### III. CONCLUSION

We affirm the trial court's order of detention.

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
1st day of August, 2013.

---

[4] We note that although these three findings are essential, even if evidence supporting these findings is "scant," other evidence may justify an order committing a juvenile to TYC. *In re K.T.*, 107 S.W.3d 65, 68–69 (Tex. App.—San Antonio 2003, no pet.). Here, even if the evidence appears "scant," the trial court also considered the safety of the community when it determined appellant's disposition.